UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
JOSE MELENDEZ, *pro se*,                                       :
                                                              :
                                        Petitioner,           :
                                                              :          **OPINION AND ORDER**
                -against-                                      :          09-cv-4373 (DLI)
                                                              :
JOHN B. LEMPKE,                                               :
Superintendent of Five Points Correctional Facility,  :
                                                              :
                                        Respondent.           :
----------------------------------------------------------------x
**DORA L. IRIZARRY, United States District Judge:**

*Pro se* petitioner Jose Melendez ("Petitioner") seeks a writ of habeas corpus pursuant to

28 U.S.C. § 2254. On November 29, 2005, Petitioner was convicted after a jury trial in New

York State Supreme Court, Kings County ("Kings County Supreme Court" or "trial court"), of

two counts of second degree murder (N.Y. Penal Law § 125.25(3)) and one count of first degree

arson (N.Y. Penal Law § 150.20(1)). On April 7, 2006, Petitioner was sentenced to concurrent

terms of twenty-five years' to life imprisonment on both murder counts and the arson count.

Petitioner challenges his conviction on the grounds that: (i) he was deprived of a fair trial

when the prosecutor elicited the grand jury testimony of prosecution witness Hector Gonzalez and

the testimony of an arresting officer bolstering Gonzalez's identification of Petitioner at trial; (ii)

Petitioner was deprived of his due process rights by the trial court when it failed to instruct the

jury that a mere probability of guilt did not rise to the level of proof beyond a reasonable doubt;

(iii) his trial counsel provided ineffective assistance; (iv) Petitioner's constitutional right to

confront the witnesses testifying against him was violated; (v) the evidence against Petitioner was

insufficient to prove his guilt beyond a reasonable doubt; and (vi) he is actually innocent. For the

reasons set forth below, the petition is denied in its entirety.

**BACKGROUND**

**A.      The Charges**

Petitioner was indicted by a New York State grand jury in Kings County and charged with four counts of murder in the second degree in violation of N.Y. Penal Law §§ 125.25(2), (3), two counts of assault in the first degree in violation of N.Y. Penal Law. §§ 120.10(3), (4), and three counts of arson in the first degree in violation of N.Y. Penal Law § 150.1(1), for allegedly setting fire to a building at 407 Wilson Avenue in Brooklyn, New York ("407 Wilson"), on January 9, 2004.  (Aff. of Rhea A. Grob, Dkt. Entry 21 ("Grob Aff."), ¶¶ 4-5.)  The fire killed two people and seriously injured a third person.  (*Id.*)

**B.      The Evidence Adduced at Trial**

At the time of the fire, 407 Wilson was a three-story building, with apartments on the second and third floors.  The Rodriguez family, which included Jasmine Rodriguez, her sisters, mother and son, lived in the second floor apartment.  The Torres family, including Ruben Torres, Sr., his wife Milagros, and their adult son, Gilbert, lived on the third floor.  (J. Torres:  238-40; R. Torres, Jr.: 253; Salgado:  276-77; Rodriguez:  624-25, 628.)[1]

Jasmine Rodriguez and Petitioner met in March 2003 and became romantically involved. (Rodriguez:  625-27.)  Petitioner, who had been living in an apartment with his friend Jose Ramos[2] and Ramos' family, moved into 407 Wilson to live with Rodriguez in October 2003.

---

[1] Citations to the trial transcript are identified by the name of the witness and corresponding page number of the transcript.  Where the citation is not to witness testimony, the transcript is cited as "Tr."  The trial transcript is attached as Exhibit 1 to the Grob Aff.

[2] At the time of the trial, Ramos was serving a sentence of two and a half years' imprisonment imposed upon his plea of guilty to stabbing another man with a knife.  (Ramos:  565-66.)  Ramos testified that he did not have a deal with the prosecution for cooperating against Petitioner. (Ramos:  570.)

(Rodriguez: 626-29.) In November 2003, Rodriguez and Petitioner broke up and Petitioner moved out of 407 Wilson and moved back into Ramos's apartment. (Ramos: 561; Rodriguez: 629.) Following the break up, Petitioner continued to visit Rodriguez at 407 Wilson, sometimes sleeping on a bench underneath the staircase on the ground floor. (Salgado: 297-98; Rodriguez: 629-30.)

At the end of November 2003, Rodriguez learned she was pregnant with Petitioner's child. (Rodriguez: 630.) Petitioner was happy about the pregnancy, but, for various reasons, Rodriguez decided to have an abortion. (Rodriguez: 630-32.) Rodriguez told Petitioner of her decision to have an abortion on December 16, 2003. (Rodriguez: 632.) Petitioner cried and begged her not to have the abortion. (Rodriguez: 632, 644-45.) A few days before Christmas 2003, Jose Salgado was visiting 407 Wilson and saw Petitioner in the hallway writing in Spanish on the wall: "Whatever you decide for me, may God give it to you twice." (Salgado: 282, 309.) Salgado asked Petitioner why he wrote that on the wall, and Petitioner said that it was meant for Rodriguez's mother. (Salgado: 283.) While the prosecution and defense stipulated Salgado had testified before the grand jury that Petitioner also said he was going to find another place to stay and leave the Rodriguez family alone, at trial, Salgado did not remember Petitioner saying that. (Stipulation: 294-96.)

A few days after Petitioner was seen writing on the wall in 407 Wilson, a mini-bike that Ruben Torres, Jr., kept in the hallway of 407 Wilson was stolen. (R. Torres, Jr.: 258-59.) Neither Ruben, Jr. nor Salgado knew who had stolen the mini-bike, but they wanted to question Petitioner about the theft and began to ask people if they knew where Petitioner was. (R. Torres, Jr.: 260-61; Salgado: 279-80.)

On January 1, 2004, Ramos went to 407 Wilson looking for Petitioner. (Ramos 561-62; Rodriguez 647.) Ruben, Jr. and Salgado saw Ramos and told him that they were looking for Petitioner in connection with the stolen mini-bike. (R. Torres: 262, 265-67.) According to Ruben, Jr. and Salgado, Ramos was "very disrespectful" to Salgado, and Salgado punched Ramos in the face. (R. Torres: 262, 267; Salgado: 281.) Ramos testified that several people in the building stopped him, demanded to know where Petitioner was, and started hitting him. (Ramos: 562, 575-76.) According to Ramos, one of them started to come towards Ramos with a hammer, threatening to break his teeth, when Ramos escaped and ran away. (Ramos: 562, 582.) A day or two later, Ramos saw Petitioner and told him that Ramos had been beaten because of Petitioner, and that Petitioner should fix the problem. (Ramos: 563.) Petitioner was drunk and upset, and told Ramos that he was going to burn the house. (Ramos: 563, 590.)

During the morning of January 8, 2004, without telling Petitioner, Rodriguez terminated her pregnancy. (Rodriguez: 633-34.) Shortly after midnight on January 9, 2004, Rodriguez and her family, as well as Rodriguez's friend Tylenea Washington and the father of Rodriguez's son, were inside the Rodriguez apartment when Washington heard a door slam and glass breaking downstairs, and smelled smoke. (Rodriguez: 634-35; Washington: 515-16, 518, 520.) Washington ran to the window, but did not see anyone. (Washington: 515, 519.) One of the Rodriguez sisters opened the apartment door and saw thick black smoke and flames. (Washington: 516, 519-20, 522; Rodriguez: 636-38.) Everybody in the Rodriguez apartment escaped to safety. (Washington: 516-17, 522-23; Rodriguez: 637.)

Hector Gonzalez, a man from the neighborhood who used to date Rodriguez and had a child with Washington, was standing on the corner outside 407 Wilson the night of the fire. (Gonzalez: 453-57.) Gonzalez testified that, from approximately 38 feet away, he saw Petitioner

walk out of 407 Wilson and then run away, right before Gonzalez saw smoke and fire come out of the building. (Gonzalez: 453-58.) Gonzalez stated that Petitioner was wearing a black jacket and was not carrying anything. (Gonzalez: 455-58.)

Virgilio Hiciano also was outside of 407 Wilson the night of the fire waiting for a friend. (Hiciano: 692.) Hiciano testified that he saw Petitioner enter 407 Wilson and then, a few minutes later, exit the building. (Hiciano: 692-93.) Hiciano said that Petitioner was wearing a blue jacket and walked out of 407 Wilson. (Hiciano: 693-94.) He did not see anybody else go into or out of the building. (Hiciano: 714.) Hiciano then sat in his car for, at most, ten minutes, before going to a friend's house, and did not see any fire. (Hiciano: 695.) While he was at his friend's house, Hiciano received a telephone call from another friend telling him that 407 Wilson was on fire. (Hiciano: 695-96.) Hiciano estimated that he returned to 407 Wilson at around 12:30 or 1:00 a.m., and that he had been gone from there for about an hour or two. (Hiciano: 696.) On cross-examination, Hiciano testified that it was between 9:30 and 10:00 p.m. when he saw Petitioner enter and exit 407 Wilson. (Hiciano: 711.) On redirect examination, Hiciano conceded that it could have been after 10:00 p.m. when he saw Petitioner, because Hiciano was not paying attention to the time. (Hiciano: 713.)

The fire department arrived at about 12:38 a.m. and began fighting the fire. (Jorgensen: 493, 496-99; Mockler: 536-37.) With the exception of the basement area, the entire building was engulfed in flames. (Jorgensen: 508-09; Mockler: 537-39.) Lt. Jorgensen, who was part of the first unit who responded to the fire, testified that the fire was so hot that the metal railings in the interior staircase were cherry red and, for the temperature to be that hot, something had to have accelerated the flames. (Jorgensen: 508, 510-11.) The firefighters fought their way into the Torres family's apartment and found three unconscious people, later determined to be Gilbert,

Ruben, Sr., and Milagros. (Jorgensen: 499-500.) Gilbert and Ruben, Sr. were taken to the hospital, but died days later. Milagros survived, though she suffered debilitating injuries. (J. Torres: 248-50; R. Torres, Jr.: 261; Salgado 284; Gilson: 746, 752.) Dr. Thomas Gilson of the Chief Medical Examiner's Office performed an autopsy on Gilbert's body and concluded that he died of complications from smoke inhalation. (Gilson: 733-47.) Dr. Gilson did not perform the autopsy of Ruben, Sr., but he reviewed the autopsy report, and concurred in the report's certified cause of death as complications from smoke inhalation. (Gilson: 747-48, 752.) The person who performed Ruben, Sr.'s autopsy did not appear at trial.

Later in the morning of January 9, 2004, Salgado received a telephone call from Petitioner, who asked if anybody had died in the fire and stated he hoped nobody had died. (Salgado: 285-86.) Sometime after the fire, Ramos saw Petitioner and asked him whether he had set the fire. (Ramos: 564-65, 596.) Petitioner told Ramos that he did set the fire. (Ramos: 564-65, 596.) Petitioner threatened Ramos and told him that, if he was walking, he could get hit by a car and be hurt and killed. (Ramos: 596.)

Gonzalez testified that, on February 3, 2004, he went to a police precinct, and was shown a lineup of people. (Gonzalez: 460.) Gonzalez testified that he picked Petitioner out of the lineup as the person he saw leaving 407 Wilson shortly before he saw the fire. (Gonzalez: 460-61.) Gonzalez said he previously had seen Petitioner in the company of Rodriguez more than once. (Gonzalez: 463-64.) On cross-examination, defense counsel asked Gonzalez whether it was true that he never saw Petitioner's face the night of the fire, and Gonzalez responded, "I seen his face, but it was too dark where I was at and turned his back. . . . I seen his face." (Gonzalez: 464.) Petitioner's counsel then presented Gonzalez the following excerpt from his grand jury testimony:

| Question: | Can you describe the person who came out? |
|---|---|
| Answer: | I ain't seen his face. Only thing I see was black, a jacket. He came out of the building and he was in a rush and he turned. |
| Question: | Okay, and when he turned, you saw the – who it was? |
| Answer: | No. |
| Question: | Did you recognize the person? |
| Answer: | No, it was night. I can't see that much that far away. All I could see. |
| Question: | You didn't see the person's face? |
| Answer: | In the paper, that's it. |

(Gonzalez 466.) Gonzalez also affirmed on cross-examination that "the only reason [Gonzalez] picked [Petitioner] out of the lineup, is that [Petitioner] was wearing the same black jacket." (Gonzalez 467.)

On redirect examination, over Petitioner's objection, the prosecution read another excerpt from Gonzalez's grand jury testimony where Gonzalez testified that he did recognize the face of the person he saw leaving 407 Wilson, and then again testified that the person Gonzalez saw leaving the building was Petitioner. (Gonzalez 470-71.) In addition, a picture of the lineup from which Gonzalez identified Petitioner was entered into evidence, and Petitioner was not wearing a black jacket in that picture. (Gonzalez 471-73.)

On recross-examination, Gonzalez testified that he was shown the black jacket separately, after he picked Petitioner out of the lineup, and told the police that it was the same black jacket Petitioner was wearing when Gonzalez saw him leaving 407 Wilson. (Gonzalez 474.) Petitioner's counsel then read the following excerpt from Gonzalez's grand jury testimony:

| Question: | Well, did you see him in the early morning hours of January the 9th? |
|---|---|
| Answer: | After he came out, not his face, no. |
| Question: | Well how are you able to identify him in the lineup, sir? |
| Answer: | He had the same black jacket. |
| Question: | In the lineup? |
| Answer: | No, cause he showed me the picture, the picture. I point him out. I seen him before with her. |

(Gonzalez: 475.) Gonzalez then agreed that the police showed Gonzalez a picture of Petitioner wearing a black jacket before showing him the lineup. (Gonzalez: 475.)

During the prosecution's second redirect examination, Gonzalez testified that the "picture" he was talking about was one of a series of six photos shown to Gonzalez earlier, on January 26, 2004, by an officer with the fire department, but that nobody showed him a picture of Petitioner on February 3, 2004 before Gonzalez picked Petitioner out of the lineup. (Gonzalez 478-79.)

The same morning, Hiciano viewed a lineup and he identified Petitioner as the person he saw leaving 407 Wilson the night of the fire. (O'Keefe: 604-05; Hiciano: 699.) The police also showed Hiciano Petitioner's black jacket, and Hiciano stated that it was different from the one he saw Petitioner wearing the night of the fire. (O'Keefe: 613, 619-20; Hiciano: 712.) Det. Michael O'Keefe, the officer who conducted the lineups for Hiciano and Gonzalez, testified that, after he ran the lineups, "as far as I was concerned, [the] case was closed." (O'Keefe: 609.) Petitioner's counsel did not object to this question and answer.

Following the lineups, O'Keefe brought Petitioner's jacket and shoelaces into the police laboratory for testing. (O'Keefe: 607-09, 619.) No common ignitable liquids were detected on those items. (McMillin: 680-81, 683-84.)

8

## C.     The Charge, Verdict and Sentence

During the jury charge, the trial court charged the jury on reasonable doubt. (Tr. 866-67.) Following the jury charge, Petitioner's counsel asked the trial court to instruct the jury that mere probability did not rise to the level of proof beyond a reasonable doubt. The trial court denied the request. (Tr. 877-78.)

The trial court submitted to the jury two counts of second degree murder, N.Y. Penal Law § 125.25(3), and first degree arson, N.Y. Penal Law § 120.10(1). (Tr. 869-73.) After deliberating, the jury convicted Petitioner on all three counts. (Tr. 881.) On January 5, 2006 and April 7, 2006, the trial court sentenced Petitioner to concurrent terms of twenty-five years' to life imprisonment on both murder counts and the arson count. (Grob Aff. ¶¶ 8-9.)

## D.     Appeal

Petitioner timely appealed his conviction to the Appellate Division of the New York State Supreme Court, Second Department ("Appellate Division"). (*Id.* ¶ 10.) Petitioner asserted that: (i) he was deprived of a fair trial because the prosecutor elicited Gonzalez's grand jury testimony and testimony from Det. O'Keefe inferentially bolstering Gonzalez's identification testimony at trial and (ii) Petitioner was deprived of due process because the trial court did not instruct the jury properly on the reasonable doubt standard. (*See id.* Ex. B ("Pet. App. Br.").) In an application dated January 11, 2008, Petitioner moved *pro se* to file a supplemental brief as part of his appeal to the Appellate Division, asserting that trial counsel was ineffective and Petitioner was deprived of a fair trial because the prosecution elicited false testimony. (*Id.* ¶ 11.)

Petitioner's *pro se* application was denied on March 10, 2008. (*Id.* ¶ 13.) On May 27, 2008, the Appellate Division affirmed the conviction. *See People v. Melendez*, 51 A.D. 3d 1040 (2d Dep't 2008). Petitioner sought leave to appeal to the New York State Court of Appeals, but

leave was denied. *See People v. Melendez*, 10 N.Y.3d 962 (2008) (Read, J.). By letter dated September 8, 2008, Petitioner moved *pro se* for reconsideration of his application for leave to appeal. (Grob Aff. ¶ 16.) This motion was denied on October 21, 2008. *People v. Melendez*, 11 N.Y.3d 834 (2008) (Read, J.).

**E.     Post-Appeal Proceedings**

On September 25, 2009, Petitioner filed a petition for writ of habeas corpus in this court raising the same claims he made on appeal and, on October 26, 2009, Petitioner filed a letter asserting that he wished to preserve for appeal claims of insufficiency of the evidence and ineffective assistance of counsel. (*See* Pet., Dkt. Entry 1; Pet'r Oct. 26, 2009 Letter, Dkt. Entry 4.) Respondent opposed the petition. (*See* Resp't Mem., Dkt. Entry 7.) On January 8, 2010, Petitioner moved to hold his petition in abeyance so he could exhaust his state remedies, which the court granted. (*See* Sept. 30, 2010 Order.)

On January 19, 2010, Petitioner moved in Kings County Supreme Court, pursuant to New York Criminal Procedural Law § 440.10 ("Section 440.10") to vacate his conviction ("Section 440.10 proceeding"). (Grob Aff. ¶ 20.) In his motion, Petitioner asserted that: (i) a change in the law required the trial court to hold that his confrontation rights were violated because the medical examiner who testified in his trial was not the medical examiner who performed the autopsy on Ruben, Sr.; (ii) his confrontation rights were violated when the trial court admitted testimony about a photograph shown to a witness where the person who took the photograph did not testify at trial; (iii) Petitioner's trial counsel was ineffective because he failed to call a man named Joshua Baez as a witness, who had told the police that he saw three people leaving 407 Wilson before the fire broke out; and (iv) Petitioner could establish that he was innocent through an unsworn statement by a person who claimed that Ramos admitted to setting the fire at 407 Wilson. (*Id.* ¶

20.)  On July 9, 2010, the Kings County Supreme Court denied Petitioner's motion to vacate the conviction, holding that Petitioner's claims could have been raised on appeal and were, in any event, without merit.  *See People v. Melendez*, 2010 N.Y. Slip Op. 33617(U) (Sup. Ct. Kings. County, July 9, 2010).  Petitioner sought leave to appeal, which was denied by the Appellate Division.  (*See* Grob Aff. Ex. O.)

Following the Section 440.10 proceeding, Petitioner filed an amended petition and the stay was lifted by the court.  (*See* Am. Pet., Dkt. Entry 19.)  In the amended petition, Petitioner referred to the claims he raised in the Section 440.10 proceeding, and requested counsel be appointed in the event that the court decided to hold an evidentiary hearing.  (Am. Pet. 2-4.) Respondent opposed the Amended Petition.  (*See* Resp't 2d Mem., Dkt. Entry 21.)

## LEGAL STANDARD

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which governs the review of petitions challenging state convictions entered after 1996, federal courts may grant habeas relief only if the state court's adjudication on the merits:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Pursuant to the AEDPA, federal courts review a state court's determination of a claim on the merits deferentially.  28 U.S.C. § 2254(e)(1).  A decision is "contrary to" federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of

materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). An "unreasonable determination" is one in which "the state court identifie[d] the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applie[d] that principle to the facts of the prisoner's case." *Id.* at 413. A federal court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the state court's application must have been "objectively unreasonable." *Id.* at 409. "[A] determination of a factual issue made by a State court shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

A petitioner cannot bring a habeas claim in federal court without first exhausting state remedies. *See Rose v. Lundy*, 455 U.S. 509 (1982); 28 U.S.C. § 2254(b)(1)(A). A petitioner's state remedies are deemed exhausted when the petitioner has:

> (i) presented the federal constitutional claim asserted in the petition to the highest state court (after preserving it as required by state law in lower courts) and (ii) informed that court (and lower courts) about both the factual and legal bases for the federal claim. Moreover, even if a federal claim has not been presented to the highest state court or preserved in lower state courts under state law, it will be deemed exhausted if it is, as a result, then procedurally barred under state law.

*McKethan v. Mantello*, 292 F. 3d 119, 122 (2d Cir. 2002) (citations and internal quotation marks and alterations omitted).

District courts cannot review a state prisoner's federal claims that are barred by an independent and adequate state procedural ground, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v.*

*Thompson*, 501 U.S. 722, 750 (1991). When a court holds that a claim is unpreserved for appellate review, it is "an independent and adequate state ground that bars a federal court from granting habeas relief." *Butler v. Cunningham*, 313 F. App'x 400, 401 (2d Cir. 2009) (citing *Coleman*, 501 U.S. at 750); *see also Reid v. Senkowski*, 961 F. 2d 374, 377 (2d Cir. 1992). Therefore, if a state court's holding contains a statement that a claim is procedurally barred based on a state rule, the federal court may not review it, even if the state court also rejected the claim on the merits "in any event." *Fama v. Comm'r of Corr. Servs.*, 235 F. 3d 804, 811 n.4 (2d Cir. 2000); *see also Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989).

If a claim has been procedurally defaulted in state court, a federal court may address its merits only if the petitioner can demonstrate a showing of cause for the default and prejudice to the petitioner, or that a fundamental miscarriage of justice will occur if the court does not review the claim. *See Murray v. Carrier*, 477 U.S. 478, 485, 492 (1986); *Wainright v. Sykes*, 433 U.S. 72, 87 (1977); *Bossett v. Walker*, 41 F. 3d 825, 829 (2d Cir. 1994). "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray*, 477 U.S. at 488; *see also Clark v. Perez*, 510 F. 3d 382, 393 (2d Cir. 2008). To establish prejudice, a petitioner must show that the alleged violation "worked to his *actual* and substantial disadvantage, infecting the entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982).

Finally, in reviewing Petitioner's claims, the court is mindful that, "[a] document filed *pro se* is to be liberally construed and a *pro se* [pleading], however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Accordingly, the court interprets Petitioner's submissions "to raise the strongest

arguments that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F. 3d 471, 474 (2d Cir. 2006) (emphasis omitted).

## DISCUSSION

### I.      Bolstering Testimony

Petitioner asserts that he was deprived of a fair trial because the prosecution improperly elicited Gonzalez's grand jury testimony, which bolstered his trial identification of Petitioner, as well as testimony from an arresting officer that inferentially bolstered Gonzalez's in-court identification testimony.   (Pet. 6.)   Petitioner raises the same arguments he made before the Appellate Division on direct appeal from his conviction.  (*See* Pet. App. Br. 18-25.)  Respondent asserts that Gonzalez's grand jury testimony was properly introduced by the prosecution on redirect examination because it explained and clarified the portion of Gonzalez's grand jury testimony that was introduced by Petitioner's counsel on cross-examination.  (*See* Resp't Mem. 7-9.)  Respondent further contends that Petitioner's claim that Det. O'Keefe's bolstering testimony deprived Petitioner of a fair trial is procedurally barred because the Appellate Division found it unpreserved for appellate review.  (*See id.* at 9-16.)

With respect to Gonzalez's grand jury testimony, as Respondent asserts, this claim was raised by Petitioner on appeal and is exhausted.  (*Id.* at 1-2.)  Specifically, the Appellate Division held that "the trial court properly allowed the prosecutor to elicit [Gonzalez's] prior consistent statement on redirect examination for the purpose of explaining and clarifying his testimony." *Melendez*, 51 A.D.3d at 1040-41.  Accordingly, the court must turn to the merits of Petitioner's claim.

"A habeas petitioner presenting an evidentiary ruling for federal review thus bears a very heavy burden of establishing the deprivation of a constitutional right."  *Warren v. Miller*, 78 F.

Supp. 2d 120, 135 (E.D.N.Y. 2000). The Second Circuit has instructed that "[i]n order to prevail on a claim that an evidentiary error deprived the defendant of due process under the Fourteenth Amendment he must show that the error was so pervasive as to have denied him a fundamentally fair trial, a concept we have described as 'elusive.'" *Collins v. Scully*, 755 F. 2d 16, 18 (2d Cir. 1985) (internal citation omitted).

Petitioner has not surmounted the heavy burden of showing that admitting Gonzalez's grand jury testimony deprived him of a fair trial. Petitioner argued before the Appellate Division that the introduction of Gonzalez's grand jury testimony that he saw Petitioner's face when he saw Petitioner leaving 407 Wilson shortly before the fire broke out inappropriately bolstered his trial testimony identifying Petitioner. (*See* Pet. App. Br. 18-21.) While there are restrictions under New York state law against introducing prior consistent statements to bolster trial testimony, this is a state policy determination that an untrustworthy statement is not made less so by repetition. *See People v. McDaniel*, 81 N.Y.2d 10, 16 (1993). However, allowing bolstering testimony does not implicate federal law. *See Ennis v. Artus*, 2011 WL 3585954, at *19 (S.D.N.Y. Aug. 12, 2011) ("[T]he claim regarding bolstering is an error of state law which is not available for habeas corpus review"); *Benitez v. Senkowski*, 1998 WL 668079, at *5 (S.D.N.Y. Sept. 17, 1998) ("[A]lthough bolstering is a practice prohibited in various states, including New York, the practice is not forbidden by the Federal Rules of Evidence and is not sufficiently prejudicial to deprive a defendant of his due process right to a fair trial." (internal quotation marks and alteration omitted)).

Moreover, contrary to Petitioner's assertion, the record does not show that the prosecution introduced portions of the transcript simply as a vehicle to give extra weight to Gonzalez's trial testimony, but rather in response to Petitioner's challenge to Gonzalez's credibility. Petitioner's

counsel first introduced Gonzalez's grand jury testimony for impeachment purposes, confronting him with his grand jury testimony that he did not see the face of the person who leaving 407 Wilson before the fire, and only saw Petitioner's face "in the paper." (*See* Gonzalez: 466-67.) It appears from the record that the prosecution introduced an additional excerpt of Gonzalez's grand jury testimony in order to give a more complete picture of Gonzalez's grand jury testimony and to contradict Petitioner's arguments. (*See* Gonzalez: 470-71.) Thus, because Petitioner opened the door for the grand jury testimony to be introduced to provide a fuller picture of Gonzalez's previous testimony, introducing the testimony did not unfairly bolster Gonzalez's trial testimony.

Petitioner's claim that he was deprived of a fair trial because Det. O'Keefe, the officer who conducted the lineup for Gonzalez, testified that, once Gonzalez identified Petitioner in the lineup, "as far as [he] was concerned, [the] case was closed" (O'Keefe: 609), is procedurally barred. During trial, Petitioner's counsel did not object to O'Keefe's testimony, and the Appellate Division held it was unpreserved for appeal, and that, in any event, any inferential bolstering was harmless. *Melendez*, 51 A.D.3d at 1041. A court's holding that a claim is unpreserved for appellate review is an independent and adequate state ground that bars a federal court from granting habeas relief. *See Reid*, 961 F. 2d at 377.

Petitioner has made no attempt to show that there is good cause for the default, and the court can discern none from the record. Moreover, Petitioner cannot show that O'Keefe's testimony infected the trial with constitutional error. As discussed previously, bolstering testimony is, at most, a violation of state law and does not implicate any federal rights. *See Robinson v. Conway*, 2010 WL 547170, at *6 (W.D.N.Y. Feb. 12, 2010) (Police officer's testimony incidentally bolstering out of court identification by witness not grounds for habeas relief).

16

Accordingly, Petitioner's claim that he did not receive a fair trial because of the prosecution's introduction of Gonzalez's grand jury testimony and O'Keefe's bolstering does not warrant federal habeas relief.

## II.     Trial Court's Reasonable Doubt Charge

Petitioner contends that he was deprived of due process because the trial court did not instruct the jury that a mere probability of guilt did not rise to the level of proof beyond a reasonable doubt.  (Pet. 7.)  Respondent counters that jury instructions are ordinarily a matter of state law and that the trial court's instructions adequately conveyed the concept of reasonable doubt.  (Resp't Mem. 16-19.)  The Appellate Division rejected this claim on the merits, holding that "[t]he jury charge, as a whole, correctly explained the concept of reasonable doubt to the jury." *Melendez*, 51 A.D.3d at 1041.  This holding was neither contrary to nor an unreasonable application of Supreme Court precedent.

A court may only grant habeas relief because of a defective jury charge when the instruction "'so infected the entire trial that the resulting conviction violates due process.'" *Jackson v. Edwards*, 404 F. 3d 612, 624 (2d Cir. 2005) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  In reviewing the jury charge, the court must consider the charge in its entirety.  *See Denis v. Upstate Corr. Facility*, 361 F. 3d 759, 760 (2d Cir. 2004).  "It is a 'well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'"  *DelValle v. Armstrong*, 306 F. 3d 1197, 1201 (2d Cir. 2002) (quoting *Cupp*, 414 U.S. at 146-47).

With respect to a reasonable doubt jury instruction, the Supreme Court has held that, while the

beyond a reasonable doubt standard is a requirement of due process, . . . so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Rather, taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury.

*Victor v. Nebraska*, 511 U.S. 1, 5 (1994) (internal citations, quotation marks and alterations omitted).

Petitioner argued to the Appellate Division, and contends here, that the trial court erred by rejecting Petitioner's request to include in the reasonable doubt jury charge that "'probably is not enough,' or that language." (Pet. App. Br. 27.) The court is unaware of any Supreme Court precedent requiring such language in a jury instruction. Even without the phrase "probably is not enough," the trial court's entire charge provided an adequate description of the prosecution's burden. The trial court instructed, *inter alia*, the jurors that: (i) must have a reason based upon the evidence for doubting Petitioner's guilt; (ii) must find Petitioner not guilty, if they are uncertain that the Petitioner is not guilty; (iii) cannot base their reasonable doubt on a guess or a whim; and (iv) do not have to be convinced of Petitioner's guilt to a mathematical certainty. (Tr. 858, 866-67.) The court finds that, for purposes of habeas review, this description of reasonable doubt conveyed to the jury the nature of the prosecution's burden, and the trial court's failure to include all the language desired by Petitioner was not objectively unreasonable.

## III.     Ineffective Assistance of Counsel

Petitioner asserts that his trial counsel was ineffective because he failed to investigate and call a witness that would have undermined the prosecution's eyewitnesses. (*See* Pet'r Oct. 26, 2009 Letter 1-2; Pet'r's Reply, Dkt. Entry 24, at 5-6.) Specifically, Petitioner points to a DD-5

form prepared by Det. O'Keefe that summarizes a statement a witness named Joshua Baez made to the police, stating that, on the night of the fire, Baez "heard what he thought was a bottle breaking" and "saw three males in dark coats in the street in front of the building," though he could not identify them.  (*See* Pet'r's Mot. to Vacate Ex. A, Dkt. Entry 19.)  Petitioner asserts that this statement is inconsistent with the Gonzalez's and Hiciano's testimony, and Petitioner's trial counsel should have investigated the statement.  (*See* Pet'r's Reply 5-6.)  Respondent contends that Petitioner has failed to meet the highly demanding ineffective assistance of counsel standard because Petitioner's trial counsel put forth a vigorous defense overall, and Baez's statement would not have helped Petitioner's defense.  (*See* Resp't 2d Mem. 5-7.)

Under the Sixth Amendment, a criminal defendant "is guaranteed not just the right to be represented by counsel but the right to the effective assistance of counsel."  *Morgan v. Bennett*, 204 F. 3d 360, 365 (2d Cir. 2000) (citing *United States v. Cronic*, 466 U.S. 648, 654 (1984); *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984)).  To show ineffective assistance of counsel, a petitioner must prove that counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 678-88, 694.  A court's review on a habeas petition must focus on whether the state court's denial of Petitioner's claim rested upon an unreasonable application of *Strickland*, which is the relevant clearly established federal law.  *See Aparicio v. Artuz*, 269 F. 3d 78, 94-95 (2d Cir. 2001).  A habeas petitioner "must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state court applied *Strickland* incorrectly.  Rather, he must show that

the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 698-99 (2002) (internal citation omitted).

Petitioner raised his ineffective assistance of counsel claim in the Section 440.10 proceeding, and it was rejected by the trial court without a hearing. *See Melendez*, 2010 N.Y. Slip Op. 33617(U), at *6-8. The trial court held that Petitioner received meaningful representation because his counsel "vigorously conducted cross examination at trial and presented a viable defense," and it should not second guess whether failing to call Baez as a witness was the best strategy. *Id.* at *8. This court concurs with the assessment made by the trial court.

Baez allegedly told Det. Keefe that he saw three individuals run out of 407 Wilson right before the fire broke out, but he did not see their faces. On the other hand, Gonzalez and Hiciano both testified that they saw Petitioner leave the building alone. Moreover, Petitioner had a motive to harm Rodriguez and her family, and had spray painted a warning to them just days before the fire. Most significantly, Petitioner admitted to Ramos that he had set the fire and threatened to harm Ramos if Ramos told anyone.

Petitioner's claim appears to rest largely on his counsel's purported failure to investigate Baez's statement, not just on his failure to call Baez as a witness. (*See* Pet'r's Reply 5-6.) As the trial court recognized, deciding whether to call a witness is a tactical determination that is within the sound discretion of the trial counsel. *See, e.g.*, *United States v. Smith*, 198 F. 3d 377, 386 (2d Cir. 1999). However, "a sound trial strategy must be based on reasonable investigations. In preparing for trial, '[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Espinal v. Bennett*, 588 F. Supp. 2d 388, 399 (E.D.N.Y. 2008) (quoting *Lindstadt v. Keane*, 239 F. 3d 191, 200 (2d Cir. 2001)), *aff'd* 342 F. App'x 711 (2d Cir. 2009). For Petitioner's trial counsel to have had a

legitimate reason not to call Baez as a witness, he would have had to investigate Baez first. *See id.* at 401 ("Courts have found that a trial counsel's failure to investigate potentially exculpatory evidence, in the absence of a reasonable explanation, falls below the constitutional standard of effective representation required by *Strickland*."); *cf.*, *Thomas v. Kuhlman*, 255 F. Supp. 2d 99, 112 (E.D.N.Y. 2003) (Weinstein, J.) ("[B]y failing to conduct an investigation of the crime scene under the circumstances of the instant case, counsel's performance fell below an objective standard of reasonableness measured under prevailing professional norms.").

The trial court did not hold an evidentiary hearing as to defense counsel's alleged failure to investigate Baez as a potential witness. Neither Respondent nor Petitioner submitted any evidence indicating what, if anything, Petitioner's counsel did in response to Baez's statement, with the possible exception of Petitioner's bald assertion that his counsel did not investigate Baez. Previously, Second Circuit precedent instructed district courts to hold evidentiary hearings where the record was incomplete in an ineffective assistance of counsel claim. *See Sparman v. Edwards*, 154 F. 3d 51, 52 (2d Cir. 1998) (per curiam) ("We believe that a district court facing the question of constitutional ineffectiveness of counsel should, except in highly unusual circumstances, offer the assertedly ineffective attorney an opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or briefs."). However, recently, the United States Supreme Court, in *Cullen v. Pinholster*, held that habeas "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 131 S. Ct. 1388, 1398 (2011). This holding applies in ineffective assistance of counsel claims where the claim has been decided on the merits by the state court, and it sets limits as to when federal courts can develop an evidentiary record. *See Pepe v. Walsh*, 2012 WL 1900545, at *10 n.26 (N.D.N.Y. May 24, 2012) (Adopting magistrate judge's conclusion that "*Pinholster* effectively

abrogates *Sparman*'s mandate that federal district courts hold evidentiary hearings when facing the question of constitutional ineffectiveness of counsel." (quotation marks omitted)).

Here, the trial court decided Petitioner's ineffective assistance of counsel claim on the merits. Thus, this court is constrained to limit its review to the state court record, even though there is no evidentiary record on the relevant point. The Second Circuit was confronted with a similar situation following *Pinholster* in *Ridgeway v. Zon*, 424 F. App'x 58 (2d Cir. 2011). In *Ridgeway*, the petitioner asserted that his trial counsel was ineffective because he purportedly failed to consult with a medical expert that could have rebutted the prosecution's expert, or call family members that could have been helpful witnesses for the petitioner. *Id.* at 59. The petitioner previously brought his claim in a state court proceeding pursuant to Section 440.10, but the record from that proceeding was "sparse, to say the least." *Id.* The Court of Appeals found that the sparse state court record "failed to establish conclusively that Ridgeway's counsel had not consulted a medical expert or ignored Ridgeway's request to call his relatives," and that it could not consider any facts adduced in an evidentiary hearing held by the district court. *Id.* at 60. Accordingly, the Second Circuit held that, "because [the petitioner] has failed to demonstrate that the adjudication of his claim based on the state-court record resulted in a decision contrary to or involving an unreasonable application of federal law, a writ of habeas corpus shall not be granted and our analysis is at an end." *Id.* (quoting *Pinholster*, 131 S. Ct. at 1411 n.20; 28 U.S.C. 2254(d) (internal citation, quotation marks and alterations omitted)).

Here, similar to *Ridgeway*, there is nothing in the record establishing that Petitioner's counsel did not actually investigate Baez's statement that there were three men fleeing 407 Wilson before the fire broke out. Thus, pursuant to *Strickland* and *Ridgeway*, Petitioner has not

"established conclusively" that his counsel was ineffective.  Accordingly, Petitioner is not entitled to habeas relief based upon the ineffective assistance of counsel.

## IV.     Confrontation Clause Claims

Petitioner claims that his right to confront the witnesses against him was violated because: (i) Gonzalez testified he was shown pictures to assist him in identifying Petitioner by an unnamed fire department official who was not called to testify, and the picture was admitted into evidence; and, (ii) the trial court admitted into evidence the autopsy report of Ruben, Sr., even though the medical examiner who performed the autopsy and drafted the report did not testify at the trial. (*See* Am. Pet. ¶ 6, Ex. A. 11-14.)  Petitioner asserts that his claim is not procedurally barred, despite the fact that it was not raised on appeal, because the grounds for this claim arose under *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) and *Bullcoming v. New Mexico*, 131 S. Ct. 2705 (2011), which were decided after his appeal.  (Pet'r's Reply 2-5; July 25, 2011 Letter from Pet'r, Dkt. Entry 25.)   Respondent contends that Petitioner's Confrontation Clause claims are procedurally barred from the court's review because, in the Section 440.10 proceeding, the trial court found that Petitioner defaulted on these claims by failing to raise them on appeal.  (*See* Resp't 2d Mem. 1-5.)  Respondent also asserts that Petitioner's Confrontation Clause claims have no merit, and directs the court to its submissions in the Section 440.10 proceeding and the trial court's decision in that proceeding.  (*See id.* at 4-5.)

In the Section 440.10 proceeding, the trial court rejected Petitioner's Confrontation Clause claims, finding that, because they are based on the trial record, they could have been raised on appeal, and, therefore, were not properly subject to review pursuant to Section § 440.10.  *See Melendez*, 2010 N.Y. Slip Op. 33617(U), at \*4-5.  The trial court also concluded that neither claim is meritorious, finding that the photo lineup was introduced by the defense, the medical

23

examiners' office is not a law enforcement arm for purposes of *Crawford* and *Melendez-Diaz*, and that the report did not incriminate Petitioner. *Id.* at *5-6.

Assuming, for the sake of argument only, that Petitioner's Confrontation Clause claims are not procedurally defaulted, they are without merit. The photograph taken by the fire department official was not a testimonial statement under *Crawford v. Washington*, 541 U.S. 36 (2004), or *Melendez-Diaz* and *Bullcoming*, assuming they apply retroactively. More fundamentally, contrary to Petitioner's contention, the picture was not introduced into evidence, but only was shown to Gonzalez in an attempt to refresh his recollection. (*See* Gonzalez: 477-81.)[3] Moreover, when the prosecution proceeded to ask questions about the picture Gonzalez saw at the fire department and any conversations he had with fire department officials, Petitioner's counsel repeatedly objected, and those objections were sustained. (*See id*. 477-85) Accordingly, Petitioner's Confrontation Clause rights were not violated.

Moreover, the trial court's finding that the autopsy report was not a testimonial statement was not an unreasonable application of federal law. In *United States v. Feliz*, which was decided after *Crawford*, but before *Melendez-Diaz*, the Second Circuit held that autopsy reports are not testimonial, and thus their admission into evidence do not violate the Confrontation Clause. 467 F. 3d 227, 232-37 (2d Cir. 2006). As another judge in this district concluded in similar circumstances, while *Feliz* was "certainly called into question" by *Melendez-Diaz*, "the court must still apply *United States v. Feliz*, 467 F. 3d 227, 231 (2d Cir. 2006), which was not explicitly overruled by *Melendez–Diaz* or a subsequent holding of the Second Circuit." *Vega v. Walsh*,

---

[3] The court notes that the trial court erroneously concluded that Petitioner's claim was not meritorious because the photograph was introduced by the defense. *See Melendez*, 2010 N.Y. Slip Op. 33617(U), at *5. In fact, the photograph was shown to Gonzalez, but not introduced into evidence, by the prosecution. (*See* Gonzalez: 477-81.) However, because Petitioner's claim lacks merit for other reasons, this error by the trial court does not warrant granting habeas relief.

2010 WL 2265043, at *4 (E.D.N.Y. May 28, 2010), *aff'd*, 669 F. 3d 123 (2d Cir. 2012). Accordingly, because it is an open question as to whether *Feliz* still controls, and it has not been overruled, it was not an unreasonable application of federal law to admit the autopsy report into evidence.

Finally, the court notes that, even if the admission of the autopsy report into evidence violated the Confrontation Clause, the error was harmless. The autopsy report was admitted to show that Ruben, Sr. died of complications from smoke inhalation (*see* Gilson: 747-48, 752), but the cause of death was not disputed at trial. Instead, Petitioner asserted that he was not responsible for setting the fire at 407 Wilson, which was unrelated to the findings in the autopsy report.

Therefore, Petitioner is not entitled to habeas relief based upon the Confrontation Clause.

## V.     Sufficiency of the Evidence

By letter to the court dated October 26, 2009, Petitioner indicated that he wishes to preserve for appeal a claim that the prosecution did not prove that Petitioner was guilty beyond a reasonable doubt. (*See* Pet'r Oct. 26, 2009 Letter 1.) Although he did not expressly include this claim in either the petition or the amended petition, in light of Petitioner's *pro se* status, the court will consider this claim as part of the amended petition. *See Erickson*, 551 U.S. at 94. However, the claim does not warrant habeas relief.

This claim is not exhausted because Petitioner failed to raise it on direct appeal and, as the claim is based on matters that appear on the record, it would be procedurally barred by state law if it were raised in state court. *See Aparicio*, 269 F. 3d at 90. Consequently, Petitioner's claim is procedurally defaulted and may not be considered by this court. *See id.*; *Bossett v. Walker*, 41 F.

3d 825, 828-29 (2d Cir. 1994). Petitioner has not attempted to demonstrate any cause for the default or prejudice.

Moreover, Petitioner's claim fails on the merits. A petitioner challenging the sufficiency of the evidence of his guilt in a habeas corpus proceeding "bears a very heavy burden." *Fama*, 235 F. 3d at 811. In reviewing a petitioner's challenge to the sufficiency of the evidence supporting his conviction, the relevant question is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This sufficiency of the evidence "inquiry does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993).

Here, there is sufficient evidence for a rational juror to determine that Petitioner was guilty beyond a reasonable doubt. The prosecution presented evidence that Petitioner had a dispute with his girlfriend, Rodriguez, and her mother because Rodriguez was planning on terminating her pregnancy. (*See* Rodriguez: 632, 644-45.) In addition, a witness testified that, a couple of weeks before the fire, he caught Petitioner writing threatening graffiti directed at Rodriguez's mother on the wall of 407 Wilson. (Salgado: 282-83.) Petitioner's friend, Ramos, testified that Petitioner told Ramos that he was going to burn down 407 Wilson a week before the fire, and then, after the fire, admitted to Ramos that he had burned down the building. (Ramos: 563-65.) Moreover, Gonzalez and Hiciano both testified that they saw Petitioner leaving 407 Wilson the night of the fire. (Gonzalez: 453-58, 461; Hiciano: 692-94.) While cross-examination revealed that Hiciano may have seen Petitioner leave 407 Wilson several hours before the fire broke out and Gonzalez's testimony as to whether he saw Petitioner's face was inconsistent and, at times, incoherent, it was

26

up to the jury to believe or disregard their testimony. *See Maldonado v. Scully*, 86 F. 3d 32, 35 (2d Cir. 1996) ("[A]ssessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on [habeas] appeal.").

Therefore, based on the totality of the evidence, a rational juror could have found Petitioner guilty beyond a reasonable doubt.

## VI. Actual Innocence Claim

Petitioner claims that he is entitled to habeas relief because he is actually innocent. (Am. Pet. 3-4.) He bases his claim on the unsworn, unofficially translated statement of a man named Milton Rivas, who allegedly served prison time with Jose Ramos, and claims that Ramos confessed that he had set the fire, not Petitioner. (*See id*.) Respondent asserts that the United States Supreme Court has not yet concluded that a claim of actual innocence, on its own, is sufficient to warrant habeas relief and Petitioner has not established that he is actually innocent. (Resp't 2d Mem. 7-20.) Petitioner's actual innocence claim was rejected by the trial court at the Section 440.10 proceeding. The trial court held that it could not credit the statement because it was unsworn, in Spanish, and the translation was not certified. *See Melendez*, 2010 N.Y. Slip Op. 33617(U), at *9.

Petitioner has not shown that he is actually innocent. The Supreme Court has explained that the threshold for such a claim would be "extraordinarily high" and the proof of innocence would have to be "truly persuasive." *Herrera*, 506 U.S. at 417; *see also Schlup v. Delo*, 513 U.S. 298, 315-16 (1995). Petitioner has not made such a showing in this instance. Rivas's statement that, while they were in prison together, Ramos confessed to setting the fire at 407 Wilson is hearsay. The statement also is handwritten and unsworn. It is in Spanish and the translation is not certified. Under these circumstances, and in light of the other evidence presented at trial,

Rivas's statement falls short of meeting the high threshold of showing actual innocence. Accordingly, Petitioner is not entitled to habeas relief on actual innocence grounds.

## **CONCLUSION**

For the reasons set forth above, Petitioner's request for relief pursuant to 28 U.S.C. § 2254 is denied in its entirety. Petitioner is further denied a certificate of appealability as he fails to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see* Fed. R. App. P. 22(b); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *Lucidore v. New York State Div. of Parole*, 209 F. 3d 107, 112 (2d Cir. 2000). The court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and, therefore, *in forma pauperis* status is denied for purpose of any appeal. *Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).


SO ORDERED.

Dated: Brooklyn, New York
         September 7, 2012


_____
                    /s/
              DORA L. IRIZARRY
              United States District Judge